Good morning. Good morning. My name is Jeffrey Martins. I represent the petitioner on this matter, Mr. Fahmy Al Haiki. Speak right up. Okay, I'll do my best. Okay. All right. I'd like to begin with just a couple of brief comments about jurisdiction. I think the Ramadan decision a couple of months ago pretty well settled this issue. After the Real ID Act, the Court has jurisdiction over questions of law, which the Ramadan Court stated included mixed questions of law and fact, that is whether or not the statutory standard meets, whether or not the established facts meet the statutory standard. And that is the question before the Court with regard to the one-year filing deadline issue for Mr. Al Haiki's asylum application. The only real difference between these – You know, Counsel, the Ramadan case isn't final. I guess you're aware of that. Yes, I am. I do believe, though, that the analysis that the Court followed in Ramadan should apply also to Mr. Haiki's situation. The only difference between the two is that Mr. Haiki has demonstrated an extraordinary circumstance rather than a changed circumstance. But both these provisions are found within the same statute, and I think that the same analysis should apply and that the Court's capable of reaching the one-year filing deadline question in this case. Your grounds here is that your client filed for this extension. That's correct. And the government took too long, two years or something, and by the time he learned that it was not granted, then he went ahead and filed his request for asylum, right? That's correct, Your Honor. What if that had been granted? Would that have given him a year from that time to file? Or is the law absolute that he has one year from the time he enters the country? The law provides for two different exceptions to the rule, whether or not there's an extraordinary circumstance or a changed circumstance. Maintaining lawful status is an example that's listed in the regulations as an extraordinary circumstance. And if the application for the extension had been approved, then he would have been able to remain in a lawful status as a visitor. So if he's in a lawful status, does he get to file within a year after? Is there some time down the line, or does he have to still file within a year after he comes into the country? I'm not sure. Yeah, then he does not have to file within the first year. He can file as long as he's maintaining that lawful status. Then the regulations also allow for a reasonable period of time once he falls out of status, considering the circumstances to whether or not the government can consider his application for asylum. Is there anything to prevent him from filing for both? In other words, petitioning for asylum, applying for asylum at the same time he filed the extension? No, Your Honor. There is no bar to applying for different applications. I think that ---- And is there any reason why that was not done here? Well, Your Honor, I believe the question before the Court is not whether or not Mr. Icke could have applied for asylum, because any individual who enters the United States can't apply during that first year unless they're really physically incapacitated to apply. The question before the Court really is whether the reason why he didn't apply is acceptable, whether or not it meets the terms of the regulations. Did he have counsel when he applied for the extension? No, he did not, Your Honor. Is there a case that says that that's extraordinary circumstances which would allow him to extend? What is it? Is there a case that says applying for an extension of temporary status equals extraordinary circumstances so as to toll the one-year time limit? No, Your Honor. No. That is definitely a question of first impression before the Court, as well as what standard review to apply to these kinds of questions. Because of the jurisdiction change, there's been very little case law either at the Board of Immigrations or at any court of appeals level regarding the one-year filing deadline. Let me ask what occurs to me as sort of a follow-up question to that, and that is, was there case law saying that the filing, the mere filing of an extent request for an extension of temporary status told the one-year statute? No, Your Honor. Not that I'm aware of. So the state of the law was unclear. That's true, Your Honor. The only analogous situation to that is the memo that I cited in Mr. Hayek's brief about how a pending application will prevent unlawful status from accruing, which I think is recognition by the government that individuals who have pending applications have certain expectations of what the law would provide for. I think in this situation, as long as Mr. Hayek believed that his visitor status could have been extended and that he could have been continued to be remaining legally in the United States, he had the expectation that there wasn't an – that he wasn't compelled, there wasn't a necessity for him to come forward and submit an application for asylum. Counsel, there's no limitation on time limit for withholding. That's true, Your Honor. On substance, does your client meet the standards for withholding? I believe he does, Your Honor. The court did go further beyond the question of whether or not to pre-remit his application and did consider his eligibility for asylum and for withholding. And her decision for withholding was simply that he had not met the burden for asylum, so therefore he had not met the burden for withholding as well. I think that the judge's decision regarding the asylum, consideration whether or not he had established well-founded fear was also fundamentally flawed for a number of different reasons. The judge primarily made two findings in that regard, that Mr. Hayek had not shown that there was a nexus to the protected ground and that because he had family members remaining in Yemen, therefore there was no reasonable possibility of future persecution and that he could resettle elsewhere within Yemen. With regards to nexus, the judge's decision doesn't consider any of the evidence that Mr. Hayek presented regarding that his fears are connected to a protected ground of political opinion. Mr. Hayek's investigations and questioning in Yemen was regarding a cousin of his who was politically active who was killed on the premises of a political organization. I think his very activities demonstrate the incompetence and corruption of the Yemeni's government, and he was killed in a manner regarding a political assassination. Then when Mr. Hayek questioned this and had intermediaries contact the government, the only result was to have a high-level government official come to him and tell him not to return to Yemen. That's all he said, though, was just do better not to return? That's right, Your Honor. Does that show persecution by itself? Well, I think it goes to his well-founded fear, Your Honor. I think under INS Eli Zechariah, circumstantial evidence can demonstrate that there's a nexus to a protected ground, and that's what we're looking at here. There isn't a direct statement to Mr. al-Hayek that he should stop his political activities. What it is is the whole context of all his experiences and the warnings and threats that he received that show that his fears are connected to the protected ground of political opinion. Who told him to stop the political activity? Was that his brother? His brother did as well. He also had another individual, Anis al-Sormi, who was an individual within the security forces in Yemen who had high-level connections, who was a friend of the family, and I think only warned him because he was a friend of the family that his activities were causing him problems and that he should leave and not come back. So I think this is the government official that I'm referring to who warned him not to return. But I think what's important for the Court to recognize is that somebody who questions a political assassination is going to be viewed in political terms. So when you consider all of the experiences and the resulting warnings that Mr. Hayek experienced, that it establishes that there is a connection to a protected ground. Was he ever arrested?  He was never arrested, Your Honor. Was he ever beaten? No. He was not beaten, Your Honor. So you're basing it upon these statements that were made to him not to come back and not to be active in political matters, right? In considering all the circumstances that led up to those warnings, that's what establishes the nexus to a protected ground in the fact that he has a well-founded fear. Want to save a little time for rebuttal? Yes, Your Honor, I appreciate that. Okay. Thank you. Thanks for your argument. Mr. Molina, now you can argue the Yemeni case. Yes, Your Honor, I won't. We should make light of it. We do appreciate often the government sends five lawyers to argue five immigration cases. And we appreciate the economy of scale in your arguing, too. So no criticism is intended. Go ahead. We judges get mixed up sometimes when we have a whole calendar of immigration cases. Exactly. Go ahead. The government finds it's a mistake of using as well. So no harm done. Go right ahead. In this case, again, the Court is dealing with the substantial evidence. Well, I should address jurisdiction first. The Court's jurisdiction remains limited over the finding that this was an untimely asylum application. In this case, the government's brief was before the Ramanan case, and Ramanan is not final. There have actually been, I believe, some inquiries made to my office about further hearing in that case. But until that is done, Ramanan is still out there. Other than say that the government's brief somehow anticipates Ramanan, the government's position is basically this. It is clear under the Real ID Act. This Court can address legal questions, legal and constitutional questions. However, the questions that are dealt with here, whether extraordinary circumstances are shown, are a discretionary determination. Each time this Court has reviewed extraordinary circumstances in other contexts, the courts have generally found this to be a discretionary type of determination. The government would agree that if the revised, amended Ramanan three-judge panel decision stands, then this panel probably has jurisdiction to consider the merits of this claim. Well, the Court still has jurisdiction to consider at least part of the merits of the untimely asylum application. If the panel decision stands, we can examine whether exceptional circumstances standard was met here, correct? The government would say no, Your Honor. The reason is because the extraordinary circumstances finding is a discretionary determination, which is entirely different than the circumstances that were at issue in Ramanan. In Ramanan, what was at issue was the changed circumstances finding of the exception to the timeliness requirement. That, the Court said, is more of a fact and law question, which the Court can review as a mixed question of law and fact. This is entirely different. Extraordinary circumstances are a discretionary finding. That puts it beyond the law and fact questions that the Court would normally address. Therefore, with that, the Court would lack jurisdiction. Now, counsel has cited the Nakamoto case as citing as, you know, suggesting that not everything that looks discretionary is discretionary. But the Nakamoto case is inapplicable in this case. The Nakamoto case dealt with INA section 242A2B2, which had a generalized limitation that that authority which is specified to be in the Attorney General's discretion shall not be subject to review. In Nakamoto, the Court addressed the case of a marriage waiver under 8 U.S.C. 1186A and said that the finding of what constitutes a good-faith marriage is something that has legal standards that the Court can review. And therefore, the Court did review those standards. The extraordinary circumstances finding, however, is and remains a discretionary consideration. Therefore, the government's argument would be that if Ramadan as revised and amended remains, then this case would still go the contrary way because this is a discretionary determination, not a factual or legal determination. But in any event, it's really unnecessary for the Court to even get to that, provided the Court finds that the finding that there was no withholding of removal stands. As counsel pointed out, the immigration judge disposed of the case by applying the asylum standards. This can be done because withholding has a higher requirement than asylum. So if one fails to meet the lower threshold, then they fail to meet the higher threshold. Here, the immigration judge considered the asylum application and denied withholding because it didn't qualify for the lesser asylum standard. So really, if the Court finds that the government's case is supported by substantial evidence in that regard, it's unnecessary to get to the jurisdictional question. But that brings us to the asylum findings made by the immigration judge. First, with regard to past persecution, the record does not compel a conclusion contrary to that made by the immigration judge. It is clear that Mr. al-Haiki was never harmed while in Yemen, nor was he even specifically threatened in a relevant context in this, in Yemen. That is, all that ever happened were, was that he made some inquiries and never quite got an answer. In the end, his uncle's friend suggested that if he goes to Paris again, he shouldn't come back. Well, his brother said something else, too, didn't he? What did he say? His brother seemed to be upset, and as the testimony states, because the brother was the head of the household. Mr. al-Haiki admitted that it's up to the head of the household to make that type of inquiry. So the brother may have been upset that al-Haiki was going around him, and that's why the brother said, you're digging your own grave. But even that is at best a cryptic statement with no indication as to why or what its basis is. Are you saying that even if, if he was credible, I think the IJA said that he was not credible on all aspects, but didn't really go into the details. But are you saying if he's credible, it still doesn't show a protected ground? That is, yes, that is correct, Your Honor. The immigration judge did consider all the evidence as if Mr. al-Haiki were credible and came to the conclusion that there was no showing of past persecution, that there was no well-founded fear of persecution, and that any persecution was not shown to be on account of one of the protected grounds. So for any of those, for those three reasons, substantial evidence stands to support the immigration judge's decision, and the Court should deny the petition for review. Now, with regard to past persecution, there was simply no harm and no serious outright threat made against him. Therefore, we'd now turn to the question of the well-founded fear. And in this particular case, again, at best there was a vague statement from his uncle's friend, suggesting that if he goes to France again, that he not return. This is not quite enough to show that there's a reasonable likelihood that he'd be harmed, because even assuming as Mr. al-Haiki would have us believe, that this statement was made because of his past inquiries, it bears mentioning that after the first inquiry, after his brother made an inquiry, there was no harm visited upon his brother. After his cousin made an inquiry, there was no harm visited upon his cousin. After Mr. al-Haiki made his first inquiry to his cousin, there was no harm to al-Haiki. After the second inquiry through another contact, with a contact in the ministry, no harm to Mr. al-Haiki. After a third contact, again, no harm. So none of this shows that the government takes any particular interest in anything Mr. al-Haiki does, or that anybody, for that matter, takes an interest in what Mr. al-Haiki does. Now, there are certain, we can, having found substantial evidence to support that finding, we can turn finally to the third ground the immigration judge found, which was that there was no showing that any of this was on account of any particular protected ground. Now, in this case, again, Mr. al-Haiki admitted that he was not a member of the same party that his killed cousin was a member of, and that he was not really actively involved in that, and admitted that he was not persecuted because of his cousin and those below context, but rather because of the inquiries he made. But again, there was no showing of any interest in him on that regard. In fact, he never had direct contact with the government in that regard. It was always barely through intermediaries that he made inquiries, and never quite got a specific answer from anybody. Now, I see that I'm running out of time, but I believe that I've run through most of my major points. If the Court has no further questions. I don't see any. Then may I sum up? Thank you. Sum up. In this case, substantial evidence supports the immigration judge's findings that there was no past persecution of Mr. al-Haiki, that he has no well-founded fear of persecution, and no persecution was shown to be on account of his political opinion or any other protected ground. While the Court would lack jurisdiction over the entitlement in this finding, as I explained, it's really unnecessary for the Court to make that finding inasmuch as the immigration judge denied withholding on the basis of asylum grounds. Therefore, the Court should deny the petition for review. Thank you much. Thank you for your argument. Rebuttal. Thank you. Just a couple of things briefly. I'm not sure exactly how a changed circumstance is a discretionary finding. An extraordinary circumstance is not. They both involve factual and legal determination. So I believe that if the Ramadan decision does stand that jurisdiction will be established because it is a mixed question of law and fact. The question before the Court is whether or not the circumstances that Mr. al-Haiki experienced meet the statutory standard of what constitutes an extraordinary circumstance. In that regard, the immigration judge failed in her analysis because she didn't do any kind of individualized analysis of the terms of the regulation for what constitutes an extraordinary circumstance. She just repeated over and over again at several points during the proceedings that extension application does not confer lawful status. And I believe she was doing this because there is an example in the regulation that states maintaining lawful status is an exception. And because of her failure to do any kind of individualized analysis, she reached the conclusion that his application was pretermitted. Mr. al-Haiki here has followed a reasonable course of conduct throughout his stay in the United States with reasonable expectations of what the law should provide for, and I believe that he's established an exception. Lastly, I think that it's very important to consider all of the evidence in the record here, because this is not a case where Mr. al-Haiki was arrested and told, stop your political activities. It's a case where it's all the circumstantial evidence together that allows the conclusion that his fears are based upon a protected ground. I see I'm just about out of time, so I'll stop right there.  Thank you very much. I just thank both sides for their argument. The case just argued will be submitted for decision. We'll proceed to the next case in the argument calendar, which is Willey v. Piccinini. If I'm pronouncing that correctly. Thank you.
judges: B. Fletcher, Siler, Hawkins